THE CHICAGO AND WESTERN INDIANA RAILROAD COM-
PANY, Appellant, *vs.* THE CHICAGO AND EASTERN ILLI-
NOIS RAILROAD COMPANY, Appellee.

*Opinion filed October 28, 1913—Rehearing denied Dec. 3, 1913.*

1. LEASES—*a grant of the "right and privilege" to use property is not a covenant to use.* A grant by one railroad company to another of the "right and privilege" to use the former's tracks and terminal facilities is not a covenant by the latter to use such property.

2. SAME—*what tends to show that no covenant to use was intended.* The fact that the rental which the lessee railroad company was to pay for the "right and privilege" of using the lessor company's tracks and terminal facilities is based upon the amount of wheelage upon such tracks indicates that the parties contemplated that if there was no use of the tracks, and consequently no wheelage, there would be no rent, which would negative the idea of a covenant to use.

3. SAME—*implied covenant must be reasonably inferable from the entire instrument.* A written contract, deliberately entered into, is the only evidence of the undertakings of the parties that can be considered, and hence if any covenant is to be implied it must be one which is reasonably inferable from a consideration of the entire instrument and not be contrary to the expressed intention of the parties.

4. SAME—*when covenant to use will not be implied.* A covenant upon the part of the lessee railroad company to continue to use the tracks and terminal facilities of the lessor company will not be implied where the contract merely grants to the lessee the "right and privilege" of using the property, and where the existence of such implied covenant is not only not necessary to the validity or enforcement of the covenants expressed but is contrary to the intent of certain provisions of the contract itself.

APPEAL from the Branch "B" Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. GEORGE A. CARPENTER, Judge, presiding.

WILLIAM S. KIES, KRETZINGER, ROONEY & KRETZINGER, and SCOTT, BANCROFT & STEPHENS, (GEORGE W. KRETZINGER, and FRANK H. SCOTT, of counsel,) for appellant.

CALHOUN, LYFORD & SHEEAN, (WILL H. LYFORD, of counsel,) for appellee.

Mr. JUSTICE VICKERS delivered the opinion of the court:

The Chicago and Western Indiana Railroad Company filed its bill in the circuit court of Cook county against the Chicago and Eastern Illinois Railroad Company for an injunction to prevent the said Eastern Illinois Company from diverting its passenger trains from Dearborn street station and the tracks of the complainant company, and for an accounting for damages alleged to have been sustained by the complainant by reason of such diversion. A demurrer was sustained to the amended bill, and complain-

ant below electing to stand by said bill, a decree dismissing the same for want of equity was entered. The decree of the circuit court was affirmed by the Appellate Court for the First District. (*Chicago and Western Indiana Railroad Co.* v. *Chicago and Eastern Illinois Railroad Co.* 172 Ill. App. 156.) The Appellate Court granted a certificate of importance, and the complainant below has perfected a further appeal to this court.

The bill alleges that by diverting all of the Eastern Illinois passenger trains at Seventy-ninth street and running them into the LaSalle street station, at VanBuren street, appellee is violating the terms of certain contracts made with appellant, and is thereby avoiding the payment of its proportion of the working expenses of the appellant's line between Seventy-ninth street and Dearborn station which otherwise would be chargeable against appellee. It is alleged in the bill that appellee's proportion of the working expenses of appellant's line would be about $85,000 per annum. Appellee abandoned the use of appellant's station and tracks for passenger business in August, 1904. If appellee is liable according to the allegations of the bill, the amount involved is approximately $750,000. The bill is, in effect, a bill for the specific performance of certain contracts entered into between the parties by enjoining the violation of the terms thereof. Since the rights of the parties grow out of their contractual relations and depend upon the construction and validity of these agreements it will be necessary to state the substance of several of these contracts.

In May, 1879, and prior thereto, appellee owned and operated a line of railway from Danville, Illinois, to Dolton, which is thirteen miles south of the city limits of the city of Chicago. At Dolton the trains of appellee were diverted to the tracks of the Cincinnati, Pittsburg and St. Louis Railroad Company and entered the city of Chicago on the west side. In May, 1879, appellee, in order to obtain terminal facilities on the south side of the city, en-

tered into a contract with J. B. Brown, which provided that said Brown would organize a railroad company for the purpose of securing to the appellee an independent and perpetual railway entrance into the city of Chicago. This contract obligated appellee to enter into possession of, and use, maintain and operate for the term of 999 years, the tracks and terminal properties that were to be constructed by the company to be organized by Brown. By this contract it was contemplated that appellee would assume all of the obligations of the contemplated company and would conduct and develop the local passenger and freight business and pay $3000 per annum on account of taxes on the main line of road during the entire term. The contemplated company was to have the right to admit other railroad companies to the use of its tracks and terminal facilities, subject to the exclusive right of appellee to handle the local passenger and freight business. It was also provided that in case other tenants were admitted to the use of the property of the contemplated company such other companies should share in the payment of the operating and maintenance expenses upon a wheelage basis. The appellee agreed to guarantee the payment of $800,000 of bonds of the contemplated company, and to provide for the payment of interest and to create a sinking fund to pay the principal of said bonds. After the payment of said bonds and all interest appellee was to be discharged from the payment of rentals except for repairs, renewals, and the like. In July, 1879, Brown organized the appellant, the Chicago and Western Indiana Railroad Company, and he became its first president. The Brown contract was assigned by him to appellant. Appellant was incorporated to build a terminal system, and was authorized to construct a line of road from the Indiana State line and from Dolton into the city of Chicago, and to construct terminal facilities in the city of Chicago for as many roads as might become its lessees. With the proceeds of the guarantee bonds the appellant

built the road from Dolton to Fourteenth street, and appellee commenced using it early in 1880. Shortly afterward the State line division was built, and the Grand Trunk Western Railway Company, the Chicago and Erie Railroad Company, the Chicago, Indianapolis and Louisville Railway Company and the Wabash Railroad Company each obtained leases from appellant and entered into the use of the Dearborn street station and certain portions of the railroad tracks. Originally the appellant was an independent company, but in 1882 its five tenant companies above named became the owners, in equal portions, of all of its stock, and since that time it has been controlled entirely through a board of directors, one of whom was named by each of the so-called tenant companies. From 1880 until 1904 appellee used appellant's railroad as an entrance to Chicago and operated its passenger trains to and from the Dearborn street station. The five tenant companies each held leases from appellant which granted the right to use different parts of the main line of appellant, as follows: To appellee, from Dolton to the northern terminus; to the Wabash, from Seventy-sixth street to the northern terminus; to the Grand Trunk, from Forty-ninth street to the northern terminus; and to the Erie and the Monon, from the State line to the northern terminus. All of the property of appellant was acquired from the proceeds of bonds, the principal and interest of which were assumed by the five tenants above named, and the amount of the annual contributions of each tenant was denominated "rentals" in the contracts.

The relation of appellant and appellee was originally created by a contract dated October 24, 1879, which is known and referred to in this record as the "original lease." This contract was intended to supersede the Brown contract, which had been previously assigned to appellant by Brown. This contract is a very long instrument and has many provisions. It will only be necessary to state some

of its most important terms. It purports to grant, demise and lease to appellee "the right and privilege" of using and running cars over the main tracks of appellant between Dolton and the terminus in Chicago and from said terminus to Dolton. Under this agreement appellee had the right and privilege of using the passenger depot of appellant in the city of Chicago when the same should be constructed, and also the freight buildings, engine houses, repair shops and other property, and it gave appellee the exclusive "right and privilege" of using certain freight buildings, switch yards, dock property, etc. It provides that the "right and privilege" of using the property demised should be exercised in common with appellant and such other company or companies as might, from time to time, obtain similar rights and privileges. Certain freight buildings, engine houses, switch yards and dock property were for the exclusive use of appellee, while the tracks, passenger depot and other premises were to be used in common with appellant and other tenant companies. The contract gave appellee the right to use said property for the full term of 999 years from the 30th day of October, 1879. It may here be stated that this agreement, as well as other agreements subsequently entered into between appellant and its several tenant companies, differentiated between property that was to be used in common by appellant and all of the tenants, which is designated as "common property," and certain other property that was set apart for the exclusive use of the several tenants, which is known in the record as "exclusive property." The "original lease" obligated appellee to pay a nominal rental of $5 per annum for the entire term, to pay all taxes, assessments and water rents upon its exclusive property, and to pay yearly $3000 on account of taxes and assessments imposed upon the "common property," and it further provided that appellee should pay $4000 monthly until $800,000 was paid, said payments to commence when possession was taken by appellee, but the monthly payment of $4000 was to be di-

minished as the capitalized rental ($800,000) was reduced by the sinking fund that was provided for. The appellee company was also to pay, on the first of each month during the term, commencing July 1, 1884, an amount of money which, together with the $4000 rental, would in thirty-five years from January 1, 1885, pay six per cent per annum upon $800,000 before that sum was reduced by the sinking fund and after that time six per cent upon the amount of the capitalized rental as reduced, and also such an amount, by way of sinking fund, as would pay off and extinguish the principal of $800,000 within thirty-five years from January 1, 1885. After the execution of this contract successive contracts of a similar character were entered into with the other tenant companies, and later, when it became necessary to raise additional funds for the purpose of extending appellant's lines and building additional facilities to accommodate the business of the several tenants, new contracts were entered into providing for the issuing of additional bonds for securing the same and for their ultimate payment. Bonds were issued secured by mortgages upon appellant's property, and the several leases of the tenant companies were assigned to a trustee as collateral security.

There were two differences between the relation of appellee to the appellant company and the other tenant companies. Appellee was obligated to pay $3000 in full of its share of the taxes upon the common property, regardless of the amount of such taxes. The other tenant companies were required to pay the balance of these tax charges. This clause in appellee's contract effected a saving to it of approximately $20,000 per annum. In other words, appellee's share of the tax charges, if the tax had been divided equally among the five tenant companies, would have been about $23,000. Under its commutation contract, however, it paid only $3000. The other difference between appellee and the other tenant companies was, that appellee, under its contract, had the exclusive right to handle all local pas-

senger business between Dolton and the Dearborn street station.

On November 1, 1882, an agreement was made between appellant and its five tenant companies which recites that the said tenant companies have become the owners, in equal proportion, of all the capital stock of appellant, amounting to five million dollars, which said companies had purchased so as to prevent the possibility of some hostile interest acquiring appellant. By this agreement it was provided that appellant should be controlled entirely by a board of directors to be selected by the stockholding companies. Appellant was continued in the control and management of the common property and in charge of the officers and employees, yet it could do no act except such as was unanimously approved by the five proprietary companies. Other contracts were made from time to time, as the same were made necessary to meet new requirements for extensions and improvements. It is not necessary to state even the substance of all these contracts, as several of them do not have any bearing upon the question to be determined in this controversy.

On July 1, 1902, it became necessary for appellant to elevate its tracks in accordance with the track elevation ordinances of the city of Chicago, and for that purpose a large amount of money was required. To meet this condition a new agreement was entered into by appellant with its five tenants. This agreement provided for the issuance of bonds under a consolidated mortgage to an amount not exceeding fifty million dollars, which should be sold and the proceeds used, in part, to take up outstanding bonds and to re-pay the several tenants their respective contributions to the sinking fund, and so much of the balance as might be necessary was to be used in elevating the tracks as required by the ordinance. This agreement had two important features, one of which was to cancel appellee's exclusive right to the local business between Dolton and

Chicago, which had been enjoyed by appellee from the beginning to the date of this contract. The other important provision was the cancellation of appellee's special privilege and exemption from the payment of taxes upon the common property other than the $3000 and the assumption by appellee of its full, equal share of such burdens. By such contract appellant agreed to pay appellee $551,246.50 for the release of appellee's special tax commutation privilege and for the release of its right to conduct the entire local business between Dolton and Chicago. This agreement provided for the operation of the common property by the several tenant companies and that the interest to accrue on the bond issue be divided among the several tenants upon the basis of the wheelage use of the property. It also provided that appellant should manage and maintain every portion of the common property, and that the cost of operation, maintenance and repair, renewals, taxes and water rents, should all be borne by the lessees in the proportion their several wheelage uses of the various portions of said railroad bore to the total wheelage use thereof, and made provision for the manner of ascertaining the amount that would be chargeable to each of the lessees.

On July 1, 1903, appellant and appellee entered into another contract, which provided for the exclusive use by appellee of certain additional freight facilities upon appellee making provision to take care of the bonds issued for the purchase of the additional premises. Under this contract appellant acquired title to certain property which it had not previously owned. The title was taken in the name of the trustee for the benefit of appellee, and such property has been used as appellee's exclusive property.

In 1903 the Chicago, Rock Island and Pacific Railway Company acquired the control of appellee through the ownership of the stock of another company which had before that time become the owner of the stock of appellee. The Chicago, Rock Island and Pacific Railway Company owned

an undivided half interest in the LaSalle street station, and
after the control of appellee passed to that company the in-
tention to divert certain of its passenger trains from the
Dearborn street station to the LaSalle street station was an-
nounced.  The other four lessee companies thereupon filed
a bill in the United States district court in their own names,
against appellee, for the purpose of enjoining appellee from
the diversion of its passenger trains from the Dearborn
street station.  The general frame of that bill, as well as
the object sought by it, was, in substance, the same as the
bill in the case at bar.  The Western Indiana Company was
not a party to that proceeding.  The district court dis-
missed the bill for want of equity.  The complainants prose-
cuted an appeal to the circuit court of appeals, and that
court affirmed the decree below, and the case is reported as
*Grand Trunk Western Railway Co.* v. *Chicago and Eastern
Illinois Railroad Co.* 141 Fed. Rep. 785.  The opinion in
the circuit court of appeals was rendered by circuit judge
Jenkins, and in the statement preceding the opinion will be
found a very full statement of the various contracts be-
tween appellant and appellee.

Appellant contends that by the several agreements above
referred to there is an expressed covenant by appellee to
use the Dearborn street station, and the tracks appurtenant
thereto, during the entire term specified, and that if no such
express covenant exists, an obligation on the part of ap-
pellee to use them for the term specified will arise by nec-
essary implication.  To these contentions appellee makes
more than one answer.  First, it is denied by appellee that
there is either an express or implied covenant to use this
property during the entire term.  Appellee contends that it
had the "right and privilege" of using the property, with-
out any absolute obligation to do so.  Appellee also further
answers, that even if a covenant to use the Dearborn street
station, and its appurtenant terminal facilities, existed, a
court of equity would not lend its aid to the enforcement

of such covenant, because it would be contrary to public policy to permit appellee to obligate itself to use a station located at a particular point for the term mentioned, regardless of the convenience or the necessities of the public. Appellee invokes the doctrine of estoppel, and insists that the final determination of the suit of the tenant companies is a bar to this suit. It is also replied to appellant's position that the bill fails to show that appellant is in any way injured by the diversion of appellee's trains to the LaSalle street station.

Whether there is an expressed covenant in any of the agreements by which appellee covenanted to use the Dearborn street station and other terminal properties is a question of construction of the various contracts between the parties. The preliminary contract entered into between Brown and appellee on January 6, 1879, contained covenants obligating appellee to continuously use certain terminal facilities therein referred to for the full term of 999 years. Appellee therein agreed to maintain and operate the road and to perform all of the obligations of the lessor in respect to said property. That contract contemplated the organization of a corporation, the building of a terminal line, and that thereafter another contract should be entered into between appellee and the company to be organized which would supersede the Brown contract. If the express covenant contained in the Brown contract had been carried forward into the subsequent agreements between appellant and appellee there could be no question in regard to the intention of the parties, but a careful examination of all of the subsequent instruments discloses that the covenant to use and operate is omitted and in lieu thereof the parties have substituted the "right and privilege." It will be found that in respect to all the business of appellee, except the local business between Dolton and Dearborn street station, the several contracts granted appellee the "right and privilege" of using said tracks and terminal facilities, and as to

the "common property" the right to use was in common
with the other tenant companies. These several instruments
nowhere contain any express covenant on the part of ap-
pellee to use the facilities with the exception above noted,
and the compensation to be paid appellant was determined
by the extent of such use. The undertaking of appellee to
operate its trains for the accommodation of the local busi-
ness from Dolton to the northern terminus was absolute
and unconditional, but appellant expressly released appellee
from this covenant by the joint lease of 1902. The grant
of the "right and privilege" to use the property is not a
covenant to use. (*Grand Trunk Western Railroad Co.* v.
*Chicago and Eastern Illinois Railroad Co. supra; Hudson
Canal Co.* v. *Pennsylvania Coal Co.* 8 Wall. 276; *Michigan
Central Railway Co.* v. *Pere Marquette Railway Co.* 128
Mich. 333; 87 N. W. Rep. 271.) During the twenty-five
years that appellee used appellant's property there were
in all thirteen contracts, or so-called leases, with appellant.
These several instruments created valuable contract rights
and under them business of great magnitude was transacted.
Such contracts are ordinarily drawn with great care, and
a reading of these several instruments will show that they
were so drawn. If it was the intention of the parties that
appellee should enter into a binding covenant to use the
premises of appellant for the full term of 999 years, it
seems that its obligation to do so would have been clearly
and unequivocally expressed. The omission to insert lan-
guage clearly imposing a covenant of such importance is to
our minds an unanswerable argument against the existence
of any intention to absolutely bind appellee to use these
properties throughout the term. Such intention is further
negatived by several expressions or clauses in the different
instruments which are inconsistent with an unconditional
obligation on the part of appellee to use the properties dur-
ing the term. Thus, in one of the leases to the other tenant
companies it is said: "If the lessees should wish to use

260 — 17

such other or additional depot, * * * and if the Chicago and Eastern Illinois Railroad Company should not wish to use such depot," etc. And in the lease of August 1, 1890, it is said: "If it shall exercise its said alleged right of user of the tracks or property of said Chicago and Western Indiana Railroad Company which lie between Oakdale and Dolton," etc. And in the joint lease of 1902 it is said: "After the date hereof each of the lessees shall have an equal right to use all of the common property upon like terms and conditions;" and in said lease it is further provided that "the rights, obligations and privileges of each of the lessees are, and shall be after the date hereof, precisely equal in respect to their several uses and rights to use the common property of the lessor." Similar expressions may be found in other of the contracts. Again, it will be noted that the rentals that appellee was obligated to pay were based upon the amount of wheelage over the common tracks. From this provision it may reasonably be inferred that the parties contemplated that if there was no use, and consequently no wheelage, there would be no liability to pay.

Appellant insists that if there is no expressed covenant binding appellee to use these premises for the full term, such covenant will be implied as necessary to give effect to the expressed covenants. Where parties deliberately commit their contract to writing, the writing itself is the only evidence of what the undertakings of the parties are that can be considered. As applied to written contracts, implied covenants are such terms as are reasonably inferable from a consideration of the entire instrument, and when a covenant is thus discovered it is as much a part of the contract as if expressly set forth therein. (Page on Contracts, sec. 1118; *Grimley* v. *Davidson,* 133 Ill. 116.) No implied covenant can be invoked contrary to the clearly expressed intention of the parties. The whole doctrine of implied covenants rests on the fundamental rule of construction that the intention of the parties as the same has

been expressed by them in the written instrument must be given effect. We have already called attention not only to the absence of an expressed covenant, but to other facts and provisions of the several contracts which seem to us to preclude a resort to the doctrine of implied covenants. The existence of a covenant by appellee to use the premises for the entire term is not essential to the validity and enforcement of the other covenants. Construing the instruments as trackage agreements, by which appellee is given the right and privilege to use the property during its pleasure, in consideration of certain payments based upon the extent of such use, there is no essential element of a valid contract omitted, and no reason is apparent why the contracts, as thus construed, would not be binding upon both parties. There is here no expressed covenant on the part of appellee to occupy and use these premises during the term, and none can be implied by construction without disregarding the plain meaning of the language of the several contracts.

· The parties have argued at great length other questions, such as whether the judgment of the United States district court operates as an estoppel against appellant to maintain this suit; whether the appellant is barred by *laches;* and whether the covenant to use the station and premises of appellant for the term mentioned, if such covenant exists, is void, as being in contravention of public policy. These questions are only important upon the hypothesis that a covenant was, in fact, made. Since, under the view that we have taken of this case, there is no covenant, either express or implied, to be enforced against appellee, it is not necessary to consider any other question.

The decree of the circuit court of Cook county and the judgment of the Appellate Court for the First District are affirmed.

*Judgment affirmed.*